OPINION
{¶ 1} Plaintiff-appellant Robert Napier appeals from the April 27, 2005, Judgment Entry of the Tuscarawas County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant Robert Napier and appellee Kandace Napier were married in August of 1975.
 {¶ 3} On February 21, 2003, appellant filed a complaint for divorce against appellee. At the time the complaint was filed, only one of the parties' four children was a minor.[1]
Appellee, on March 5, 2003, filed an answer and counterclaim.
 {¶ 4} Subsequently, a trial before a Magistrate commenced on March 15, 2004. At the hearing, the parties stipulated that they had filed for bankruptcy. The following evidence was adduced at the trial.
 {¶ 5} At the trial, appellant, who has an associate's degree and has been in sales for over twenty-nine years, testified that he worked for twelve to thirteen years at Scaly Chemical before quitting in 2001 after he got fed up with his boss. When he left Scaly, appellant was earning $100,000.00 a year plus expenses and had a 401k valued at $96,000.00.
 {¶ 6} In 2001, appellant earned $57,000.00 working for Transtar Auto Body Technologies. Appellant testified that he and appellee liquidated his 401k and received $59,000.00 which was used over a period of time to pay bills and to maintain the parties' lifestyle since appellant's income was down. According to appellant, at the end of 2001, the parties had substantial credit card debt and, in April of 2002, took out a $92,000.00 second mortgage on their house. At such time, the first mortgage balance was $65,000.00. Thus, the parties had mortgages totaling $157,000.00. From the proceeds of the second mortgage, all but $10,000.00 of the parties' existing debt was paid off.
 {¶ 7} In 2002, appellant left Transtar and went to work for Klase Enterprises dba United Sales as its Director of Sales at an annual salary of approximately $100,000.00.[2] In addition to his salary, Klase pays appellant's car expenses, including his monthly loan payment, gasoline and repairs. Appellant also has health insurance through Klase at a cost of $84.59 per week and another $96.15 per week is deducted from his pay for his 401K. Appellant also has pension benefits through Oxford Chemical, a former employer, and through Transtar.
 {¶ 8} Appellant's written contract with Klase gives him an option to purchase up to 10% of the company's outstanding stock after two or three years of employment if appellant meets certain goals. When asked why he would want to buy 10% of the company, appellant testified that "[b]ecause of the way these guys live. They must do quite well." March 15, 2004, Transcript at 72. In order to increase his sales, appellant used his personal credit cards to entertain customers, including taking them to "gentlemen's clubs". From April of 2002, until December of 2003, when the parties' bankruptcy petition was filed, $135,000.00 in credit card debt was accumulated. Appellant testified that appellee was responsible for $12,000.00 of such credit card debt and also was partially responsible for another $55,000.00 of the credit card debt.
 {¶ 9} Testimony also was adduced that appellant used a sole proprietorship called N N Supply, which he operated out of his house and which sold paper products and other supplies, to support his sales goals at Klase. In 2002, appellant claimed $21,000.00 in unreimbursed business expenses that he admitted the majority of which "probably" went on credit cards. March 15, 2004, Transcript at 108. Appellant also took vehicle expenses of $9,763.00 for N N. In 2003, N N showed a net loss of $14,591.00.
 {¶ 10} Testimony was adduced at the hearing that appellant was taking Celebrex, Xanax and Viagra. Appellant's net income each week is $1,044.22. Appellant testified that his monthly expenses were $4,000.00.
 {¶ 11} At the trial, testimony was adduced that appellee, who does not have a college degree, had her first child in 1976 and had children in 1979, 1981 and 1985. From 1979 until the parties separated in 1987, appellee was a stay at home mom. After the parties reconciled in 1988 or 1989, they purchased appellee's family home, which was placed in appellee's name. Testimony also was adduced that, because of the parties' bankruptcy, they lost their home, which had been in appellee's family for seven generations.
 {¶ 12} At the trial, appellee testified that she met appellant in college and that she had only completed one year, quitting after the parties' married. At the time of the trial, appellee was employed as a secretary at an investment firm. Appellee testified that she had been working as a secretary at the firm for seven years, had been working full time for the past four years and that, during the marriage, she was a stay at home mother for approximately thirteen years while appellant traveled for work. Appellee earns approximately $24,000.00 a year, takes home $740.00 every two weeks and has no special bookkeeping or computer skills. Appellee testified that she was "probably as high as I can go for an uneducated woman that [sic] had [been] out of the work force for so many years." April 14, 2004, Transcript at 44. Appellee previously worked for Banc One for two years starting in 1987 after appellant left home and had an affair. During such time, appellee and the children resided with her parents. After the parties reconciled a year later, appellee continued working for another year.
 {¶ 13} Appellee further testified that she was unaware of the parties' credit card debt when appellant took out the second mortgage on the house and that she did not learn of the same until the closing. Appellee further testified that she thought that it was a refinancing rather than a second mortgage and that appellant told her that since they had children in college, they needed more money to live on. According to appellee, the parties paid off approximately $73,000.00 using the proceeds from the second mortgage. When asked whether there were any agreements made at that point about future use of credit cards, appellee responded as follows:
 {¶ 14} "A. Verbal agreements, yes.
 {¶ 15} "Q. Between who?
 {¶ 16} "A. I'll sign it, you get rid of the credit cards.
 {¶ 17} "Q. Did that happen?
 {¶ 18} "A. No. April 14, 2004, Transcript at 26-27.
 {¶ 19} In addition to taking Prozac, appellee takes Zocor for high cholesterol and Xanax for anxiety and panic attacks. While, at the time of the trial, appellee did not have medical insurance through her employer, she testified that she was intending to purchase the same at a cost $50.00 to $60.00 per paycheck. Appellee testified that she got paid twice a month[3] and that she had approximately $7,000.00 in a 401K plan.[4]
Since the parties were losing their house in the bankruptcy, appellee testified that she was going to rent a house that her parents owned for $450.00 a month plus electric.
 {¶ 20} The Magistrate, in a decision filed on July 28, 2004, recommended that appellant be ordered to pay spousal support to appellee in the amount of $2,000.00 per month, that appellant be ordered to pay 75% of any bills not discharged in bankruptcy, and that appellant be ordered to pay 75% of appellee's attorney fees. Appellant then filed objections to the Magistrate's Decision.
 {¶ 21} As memorialized in a Judgment Entry filed on April 27, 2005, the trial court adopted the Magistrate's Decision with slight modifications. With respect to spousal support, the trial court ordered that the spousal support of $2,000.00 a month continue until the death of either party or until appellee cohabited with "another adult person in a relationship which involves sexual activity and the sharing of expenses."
 {¶ 22} Appellant now raises the following assignments of error on appeal:
 {¶ 23} "I. THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED ERROR PREJUDICIAL TO APPELLANT IN FAILING TO FIND APPELLEE COMMITTED FINANCIAL MISCONDUCT AGAINST APPELLANT.
 {¶ 24} "II. THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PREJUDICIAL ERROR IN ADOPTING THE MAGISTRATE'S DECISION FINDING APPELLANT COMMITTED FINANCIAL MISCONDUCT AND GRANTING A DIVORCE BASED UPON FINANCIAL MISCONDUCT GROUNDS.
 {¶ 25} "III. THE PERMANENT SPOUSAL SUPPORT AWARD OF $2,000.00 PER MONTH TO A WIFE WHO IS UNDER NO DISABILITY AND WAS EMPLOYED WITH JOB SKILLS AND WORKING FOR AN INVESTMENT COMPANY WAS AN ABUSE OF DISCRETION AND PREJUDICIAL TO THIS APPELLANT.
 {¶ 26} "IV. THE TRIAL COURT ABUSED ITS DISCRETION IN ADOPTING THE MAGISTRATE'S DECISION AWARDING APPELLEE AN ATTORNEY FEE OF $9,000.00 WHERE NO STATUTORY EVIDENCE WAS OF RECORD FOR SUCH AN AWARD."
 I {¶ 27} Appellant, in his first assignment of error, argues that the trial court erred in failing to find that appellee had committed financial misconduct. We disagree.
 {¶ 28} R.C. 3105.171(E)(3) states that "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." A determination on financial misconduct lies in the trial court's sound discretion. Huener v. Huener (1996),110 Ohio App.3d 322, 674 N.E.2d 389. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 29} Appellant, in the case sub judice, specifically argues that appellee had committed financial misconduct by violating two restraining orders. The March 7, 2003, restraining order stated, in relevant part, as follows:
 {¶ 30} "It is further ORDERED that the Plaintiff be and is hereby restrained and enjoined from selling, encumbering, transferring, hiding, destroying, disposing of, or removing from its present location any real estate, bank accounts, wages or earning, motor vehicles, stocks, bonds, insurance policies, household furniture, furnishings, and any and all tangible and intangible personal property of the parties during the pendency of this action" (Emphasis added).
 {¶ 31} In turn, the April 24, 2003 order stated, in pertinent part, as follows:
 {¶ 32} "It is, further, Ordered that both parties shall refrain from any joint credit card debt except for business and legitimate personal expenses. If there is any doubt as to what is a legitimate personal expense, each party should confer with their attorney."
 {¶ 33} Appellant contends that appellee violated the two restraining orders by taking $1,500.00 from a medical account and never reporting the same to the trial court, by removing appellant's six guns and dissipating the same, and by spending monies from a Bank One credit card. Appellant also maintains that appellee committed financial misconduct by selling joint stocks without appellant's consent and retaining the proceeds totaling $684.42.
 {¶ 34} As an initial matter, we note that the March 7, 2003, restraining order restrains appellant, not appellee.
 {¶ 35} With respect to the guns, testimony was adduced at the trial that the guns, which the parties stipulated were worth approximately $1,000.00, had been removed from appellee's house and were "in a safe place under lock and key." March 15, 2004, Transcript at 12. Appellee indicated at the trial that the guns were available for appraisal at any time. The Magistrate, in her July 28, 2004, decision, stated that the guns were being held by the Tuscarawas County Sheriff and that "[t]hese guns should be addressed through the criminal proceeding" against appellant.[5] Appellee clearly did not "dissipate" the guns as appellant alleges.
 {¶ 36} Testimony also was adduced that the medical account that appellee took money out of was her own employee medical savings account. Appellee testified that she had put money into such account and then received a total of $1,500.00 from such account at the end of 2003, representing funds that were not expended. Appellee further testified at the trial that she used $3,036.89 of the Bank One credit card proceeds for her portion of the costs of her daughter's October, 2003, wedding and $2,579.09 for vacations after the parties separated. Finally, while appellee did sell joint stock without appellee's approval, the amount of proceeds that she retained were small, amounting to $684.42.
 {¶ 37} Based on the foregoing, we find that the trial court did not err in refusing to find that appellee had committed financial misconduct since the trial court's decision was not arbitrary, unconscionable or unreasonable. The amounts of money at issue were small and/or were, for the most part, justified by appellee.
 {¶ 38} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 39} Appellant, in his second assignment of error, contends that the trial court erred in finding that appellant had committed financial misconduct and in granting a divorce based on financial misconduct grounds. We disagree.
 {¶ 40} As an initial matter, we note that while appellant argues that R.C. 3105.01(A) through (K) does not list financial misconduct as a ground for divorce, the trial court granted appellee a divorce from appellant upon the ground of gross neglect of duty also. Appellant does not dispute that gross neglect of duty is a ground for divorce.
 {¶ 41} With respect to appellant's argument that the trial court abused its discretion in finding that appellant had committed financial misconduct, we find that the trial court's decision was not arbitrary, unreasonable or unconscionable. At the trial before the Magistrate, testimony was adduced that appellant used personal credit cards to entertain clients and did not seek reimbursement from his employer. At the time appellant went to work for Klase, the parties had paid off all except $10,000.00 of their credit card debt using the proceeds from the second mortgage. From April of 2002 until December of 2003, $135,000.00 in credit card debt was accumulated. The following is an excerpt from appellant's testimony at the trial:
 {¶ 42} "Q. And then from April 2002 until December of 2003, when you filed your bankruptcy petition, there was a Hundred and Thirty-Five Thousand Dollars ($135,000.00) in credit card debt accumulated again, right?
 {¶ 43} "A. That's correct.
 {¶ 44} "Q. And approximately Twelve Thousand ($12,000.00) of that were cards that were in Kandy's name?
 {¶ 45} "A. No actually —
 {¶ 46} "Q. Or that she used?
 {¶ 47} "A. Actually the American Express at some point until we were separated was in her name also. The Discover card was in her name also. I had it removed whenever I got removed.
 {¶ 48} "Q. Let me ask you this, are you saying that of a Hundred and Thirty-Five Thousand Dollars ($135,000.00) that's on all of those credit cards that are listed on that bankruptcy petition, which is Joint Exhibit Eighteen, Joint Exhibit Eighteen. Are you saying that more than Twelve Thousand Dollars ($12,000.00) was attributable to things that Kandy purchased with the cards?
 {¶ 49} "A. Not just Kandy. There was I think Fifty-Five Thousand ($55,000.00) when we got separated. Of which we went on trips, ah, we went out to eat, paid for the kids things, and so on and so forth. So I'm just saying I don't want to take credit for the whole Hundred and Thirty Thousand Dollars ($130,000.00). . . .
 {¶ 50} "Q. Okay. So my question to you is, the Twelve Thousand Dollars ($12,000.00) that were on the cards that she listed on the bankruptcy, subtract that from the One Thirty-Five ($135,000.00), okay? So that leaves us with a Hundred and Twenty-three Thousand Dollars ($123,000.00) in credit cards accumulated since April of 02. If you had ten ($10,000.00) left. So you had a Hundred and Thirteen Thousand Dollars ($113,000.00) of charges from April of 02 to December of 03. I want you to tell the Court, under oath, what percentage you think is attributable to Kandy?
 {¶ 51} "A. To Kandy and I or just to her?
 {¶ 52} "Q. Well let's ask it another way. Give me a percentage that you think is attributable to you taking the customers of Klase Enterprises out or the customers of N N Supply out to support your efforts at Klase?
 {¶ 53} "A. Well, like I said, it was Fifty-Five Thousand ($55,000.00) whenever we separated. I would, I would venture to say probably close to half that was attributable to us taking trips to Toronto, Put-in-Bay, ah, I couldn't say no, to, to be honest with you." March 15, 2004, Transcript at 81-84. Appellant further testified that, in order to buy into Klase, he had to increase his sales every year and that, in order to do so, he used his credit cards "to spend some money that they [Klase] didn't want to spend." March 15, 2004, Transcript, at 85.
 {¶ 54} At the trial, Kevin Bick, who is appellant's co-worker at Klase, testified that he used his own credit card to wine and dine customers and then got reimbursed by Klase. Bick also testified that he did not have a business on the side.
 {¶ 55} Testimony also was adduced that appellant formed N N Supply, a sole proprietorship, to support his sales goals at Klase. The following is an excerpt from appellant's trial testimony:
 {¶ 56} "Q. Okay. So in 2002 — go ahead and take a look at that. That would be part of the one exhibit. I believe that's number one (1). Employee business expenses outside sales, Twenty-One Thousand Dollars ($21,000.00). Those are expenses that you paid [for N N Supply]?
 {¶ 57} "A. Out-of-pocket.
 {¶ 58} "Q. Out-of-pocket that probably went on credit cards?
 {¶ 59} "A. Probably the majority of it, yes.
 {¶ 60} "Q. To support your goals at Klase and Company?
 {¶ 61} "A. Yes.
 {¶ 62} "Q. And you show on there vehicle expense. What does it show?
 {¶ 63} "A. Ninety-Seven Sixty-Three ($9,763.00), Nine Thousand Seven Hundred and Sixty Three ($9,763.00).
 {¶ 64} "Q. Dollars? Is that based on mileage?
 {¶ 65} "A. I would think, yes. I thought there was some kind of supporting thing that —
 {¶ 66} "Q. Well, go back to the schedule C and see if it's posted in there, because I didn't see it after that. See if you see something that shows — You've got Ninety-Seven Hundred Dollars ($9,700.00) —
 {¶ 67} "A. Yes, it was . . ., Twenty-Six Thousand Seven Hundred and Forty-Nine miles (26,749).
 {¶ 68} "Q. For N N Supply.
 {¶ 69} "A. Yes.
 {¶ 70} "Q. And then Ninety-Seven Hundred for what you're calling outside sales, which is travel expenses for Klase that they won't even pay you for?
 {¶ 71} "A. Right.
 {¶ 72} "Q. And they're paying your car payment.
 {¶ 73} "A. No, excuse me. I don't that that was Klase was it? Part of that was Klase and part of it was Transtar.
 {¶ 74} "Q. Oh, okay.
 {¶ 75} "A. Transtar only paid up to a certain amount of my expenses and I was responsible for the remainder.
 {¶ 76} "Q. But you had the same deal going with Klase. You call it outside sales?
 {¶ 77} "A. Yes.
 {¶ 78} "Q. So those are the expenses that you incurred yourself that they won't let you put on their credit card?
 {¶ 79} "A. Correct.
 {¶ 80} "Q. So when it's vehicle expense, they pay for your car and they pay for some of your gas and they pay for some of your repairs and then the rest of that vehicle expense is what's on there as outside sales, out of your own pocket?
 {¶ 81} "A. Correct.
 {¶ 82} "Q. It's on credit cards? Most is on credit cards?
 {¶ 83} "A. Most of this, yes." March 15, 2004, Transcript at 107-109.
 {¶ 84} In addition, at the trial, appellant admitted that he regularly took money out of the N N checking account in the form of either cash or checks payable to himself. In 2001, appellant took out approximately $11,000.00, in 2002, he took out $13,199.00 and in 2003, he took out $4,200.00. Appellant sometimes charged items on the parties' personal credit cards to purchase supplies for N N Supply and then resell.
 {¶ 85} Based on the foregoing, we find that the trial court's finding that appellant committed financial misconduct did not constitute an abuse of discretion. From the record, it is apparent that appellant charged tens of thousands of dollars to the parties' personal credit cards for business purposes and either did not seek reimbursement for the same or knew that he was not entitled to reimbursement for such expenditures. In addition, there was evidence that appellant used the parties' personal credit cards to buy products for N N which he then resold and that appellant kept charging on the parties' personal credit cards throughout the case. In short, we find that the trial court's decision was not arbitrary, unconscionable or unreasonable.
 {¶ 86} Appellant's second assignment of error is, therefore, overruled.
 III {¶ 87} Appellant, in his third assignment of error, challenges the trial court's award of spousal support. Appellant specifically argues that the trial court abused its discretion in awarding $2,000.00 a month in spousal support to appellee and in failing to set a specific termination date for the spousal support. We disagree.
 {¶ 88} Appellate review of a spousal support award is done under a very high standard giving great deference to the trial court's decision on the issue. Easton v. Tabet (Aug. 12, 1996), Stark App. Nos. 1995CA00313, 1995CA00296, 1996 WL 488794. A trial court's decision concerning spousal support may only be altered if it constitutes an abuse of discretion. Kunkle v. Kunkle
(1990), 51 Ohio St.3d 64, 67, 554 N.E.2d 83. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 218, 450 N.E.2d 1140.
 {¶ 89} Appellant initially contests the permanency of spousal support and argues that the trial court should have specified that spousal support would terminate upon loss of job, disability, death, and/or social security age. In Kunkle v.Kunkle, supra, the Ohio Supreme Court held, at paragraph one of the syllabus: "Except in cases involving a marriage of long duration, parties of advanced age or a homemaker-spouse with little opportunity to develop meaningful employment outside the home, where a payee spouse has the resources, ability and potential to be self-supporting, an award of sustenance alimony should provide for the termination of the award, within a reasonable time and upon a date certain, in order to place a definitive limit upon the parties' rights and responsibilities."
 {¶ 90} In the case sub judice, the parties were married for nearly thirty years. During most of the marriage, appellee was a stay at home mother caring for the parties' four children while appellant worked and often traveled for work. While appellant has an associate's degree and earns $100,000.00 a year and has the potential to earn even more, appellee only has a high school education and has no special computer or bookkeeping skills. As a full time secretary, appellee earns approximately $24,000.00 a year. At the trial, appellee testified that she did not anticipate making substantially more money due to her lack of higher education. Based on the foregoing, we find that the trial court did not err in granting spousal support that was only terminable upon the death of either party or upon appellee's cohabitation with "another adult person in a relationship which involves sexual activity and the sharing of expenses."[6]
 {¶ 91} Appellant also argues that the amount of spousal support is too high. Pursuant to R.C. 3105.18(C)(1), in making a determination concerning spousal support, the trial court must consider certain factors. R.C. 3105.18(C)(1)states, in relevant part, as follows:
 {¶ 92} "In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 {¶ 93} "(a) The income of the parties, from all sources * * *;
 {¶ 94} "(b) The relative earning abilities of the parties;
 {¶ 95} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 96} "(d) The retirement benefits of the parties;
 {¶ 97} "(e) The duration of the marriage;
 {¶ 98} "(f) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 99} "(g) The standard of living of the parties established during the marriage;
 {¶ 100} "(h) The relative extent of education of the parties;
 {¶ 101} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 102} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 103} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 104} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 105} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 106} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 107} As is stated above, in the case sub judice, evidence was adduced that the parties were married for nearly thirty years. Appellant, who was fifty years old at the time of the trial, has an associate's degree and earns in the neighborhood of $100,000.00 per year. He has the potential to earn even more and to buy into his current employer's company. Appellant has a pension worth approximately $8,700.00 and 401k worth $1,200.00. His monthly expenses were approximately $4,000.00 a month.
 {¶ 108} In turn, testimony was adduced that appellee earns approximately $24,000.00 a year as a secretary,[7] or $2,000.00 a month.[8] Her stated monthly expenses were $2,731.00 a month. Appellee, who was forty eight years old at the time of trial, quit college to care for the parties' children and was a stay at home mother for most of the marriage. She testified that she has no special computer or bookkeeping skills. Testimony was also adduced that she has advanced as far as possible in her current employment based upon her lack of higher education.
 {¶ 109} Appellee has high cholesterol and anxiety attacks and takes Prozac for menopause. At the trial, she indicated that she was planning on purchasing medical insurance through her employer at a cost of $50.00 to $60.00 each pay check. She has a 401k worth $7,824.06.
 {¶ 110} Based on the foregoing factors, we find that the trial court's award of $2,000.00 a month in spousal support to appellee was not arbitrary, unconscionable or unreasonable.
 {¶ 111} Appellant's third assignment of error is, therefore, overruled.
 IV {¶ 112} Appellant, in his fourth assignment of error, argues that the trial court abused its discretion in ordering appellant to pay $9,000.00 towards appellee's attorney fees "where no statutory evidence was of record for such an award." We disagree.
 {¶ 113} An award of attorney's fees lies within the sound discretion of the trial court. Rand v. Rand (1985),18 Ohio St.3d 356, 359, 481 N.E.2d 609 In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 114} While, with respect to the issue of attorney fees, appellant cites to R.C. 3105.18(H), appellee cites to R.C.3105.73.
 {¶ 115} Revised Code 3105.73, states in pertinent part:
 {¶ 116} "(A) In an action for divorce, dissolution, . . . the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate."
 {¶ 117} Previous R.C. 3105.18(H), deleted effective April 27, 2005, stated the following regarding attorney fees: "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees."
 {¶ 118} However, regardless of which statute applies, we find that the trial court did not err in ordering appellant to pay appellee's attorney fees in the amount of $9,000.00. As is stated above, appellant, who earns approximately $100,000.00 a year, earns substantially more than appellee and has the potential to even earn an even higher salary and to buy into the company that he now works for. Appellant clearly had the ability to pay the $9,000.00 in fees. Appellee, who earns less than $30,000.00 a year, testified that she had to borrow $2,000.00 on a credit card to pay her attorney's retainer, that she took a cash advance on her credit card to pay some of her legal bills and that she made a $1,500.00 payment to her attorney in November of 2003 using her credit card. Up through the April 15, 2004, trial date, appellee had incurred approximately $12,000.00 in legal fees and costs. Moreover, as is stated in detail above, there was overwhelming evidence adduced at trial that appellant had committed financial misconduct.
 {¶ 119} Based on the foregoing, we find that the trial court's order requiring appellant to pay $9,000.00 of appellee's attorney fees was not arbitrary, unconscionable or unreasonable.
 {¶ 120} Appellant's fourth assignment of error is, therefore, overruled.
 {¶ 121} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas is affirmed.
Edwards, J. Farmer, P.J. and Wise, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] The parties' other three children were adults on the date the complaint was filed.
[2] Appellant's W2 for 2003 showed $97,423.36 in income.
[3] Appellee is actually paid every two weeks.
[4] The balance was $7,884.06 as of December 31, 2003.
[5] Appellant was arrested for domestic violence in 2004 after getting into a fight with his son.
[6] See Wharton v. Wharton, Fairfield App. No. 02 CA 83, 2003-Ohio-3857, in which this Court held that the trial court was not required to set a termination date for spousal support. InWharton the parties were both 46 years old at the time of the divorce decree and were married almost 26 years. While the wife's income was approximately $15,500.00 per year, the husband's average income was $55,525.00. In addition, the wife's only job skills were light secretarial work.
[7] In 2003, appellee earned $24,224.94.
[8] While the Magistrate found that appellee's net income was $740.00 twice per month, appellee is actually paid bi-weekly and sometimes is paid three times a month. Based on a salary of $24,000.00, appellee's income would be $2,000.00 a month.